NATIVE ECOSYSTEMS COUNCIL, a non-profit corporation; Bear Creek Council, a non-profit corporation, Plaintiffs–Appellants,

v.

Michael DOMBECK, in his official capacity as Chief of the U.S. Forest Service; Daniel Glickman, in his capacity as Secretary of Agriculture; Kempter M. McMaster, in his official capacity as United States Fish & Wildlife Service Montana Field Supervisor; David Garber, In his official capacity as Supervisor of the Gallatin National Forest; Bruce Babbitt, in his official capacity as Secretary of the Interior, Defendants–Appellees.

No. 01–35827.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 1, 2002.

Filed Sept. 16, 2002.

Jory C. Ruggiero, Beck, Richardson & Amsden, Bozeman, MT, for the plaintiffs-appellants.

Thomas L. Sasonetti, Attorney General's Office, and David C. Shilton, Katherine J. Barton, Department of Justice, Washington, DC, for the defendants-appellees.

Before: D.W. NELSON, THOMPSON and PAEZ, Circuit Judges.

D.W. NELSON, Circuit Judge.

Plaintiff environmental groups Native Ecosystems Council and Bear Creek Council (collectively, "Bear Creek") seek

review of a timber sale slated to occur on national forest lands in Montana. They appeal the district court's grant of summary judgment in favor of defendants, who are officials within the United States government responsible for approving the timber sale.

We have jurisdiction under 28 U.S.C. § 1291. Because the United States Forest Service did not consider the cumulative impacts of some aspects of the sale sufficiently to satisfy the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and did not comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The Darroch–Eagle timber sale is proposed to occur on 226 acres of the Gallatin National Forest in Montana, located on the northern boundary of Yellowstone National Park. The project area supports grizzly bears, bighorn sheep, elk, mule deer, moose, mountain lions, and wolves, among other wildlife. The sale would harvest approximately 2.1 million board feet of timber.

The proposed sale is part of a larger, Congressionally-authorized program to provide funding to acquire about 55,000 acres of privately-held land within the borders of the Gallatin National Forest. See Gallatin Land Consolidation Act of 1998, Pub.L. No. 105–267, 112 Stat. 2371 (1998). Through this act, Congress authorized the Forest Service to buy particular parcels of private land in exchange for approximately 31,700 acres of federal land, $4.15 million in federal and private funds, and $4.5 million in receipts from timber sales. Id. at § 4(a). To fund the timber sale contribution to the program, Congress directed the Secretary of Agriculture to "implement a timber program . . . to generate sufficient timber receipts." Id. at § 4(c). The Darroch–Eagle timber sale, the only sale in dispute here, is one of approximately twelve sales earmarked to provide receipts for the land exchange. Together, these proposed sales constitute the Gallatin II Timber Sale Program. All are slated to occur within the Gallatin National Forest.

The Gallatin National Forest is managed in accordance with the Gallatin National Forest Plan ("Forest Plan"), adopted pursuant to the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq. Because Bear Creek focuses part of its challenge on the proposed sale's treatment of road density, we summarize the sale's effects on roads, and the Forest Plan's requirements for road density, in some detail. The Forest Plan contains a maximum road density standard to be achieved throughout the forest. This standard is quantified by a Habitat Effectiveness Index, or HEI. An indicator of how open roads and motorized trails might affect habitat use by elk, the HEI represents the percentage of an analysis area that is available for use by elk. The larger the HEI for any given area, the fewer the roads.

The Forest Plan requires that an HEI of 70% be maintained throughout the forest, and the Forest Service interprets this requirement to mean that it must achieve a 70% HEI following timber sales, even if doing so necessitates closing roads.

The challenged Darroch–Eagle sale calls for the construction of about 0.6 miles of new road and the reconstruction of 4.4 miles of existing road to access the harvest areas. Within two years of the sale, the Forest Service plans to close all newly constructed and reopened roads. However, as the Forest Service concedes, the road mileage that would remain open after the sale violates the Gallatin Forest Plan

standard for road density following a timber sale. After the sale, the site will have an HEI of about 53%, not 70% as required.

For the Darroch–Eagle sale to comply with the Forest Plan's HEI standard, the Forest Service would have to close about nine to eleven miles of road after the timber sale was complete. Conceding this, but stating that such closure was not "necessary nor is it a reasonable requirement for a single timber sale entry," the Forest Service chose to adopt a site-specific amendment to the Forest Plan waiving the HEI requirement for this sale. The government argues that the road density at the project site after the sale will be almost the same as the road density before the sale. Nevertheless, the road density amendment will effectively relieve the Forest Service of its duty under the Forest Plan, triggered by the timber sale, to close between nine and eleven miles of road.

The Forest Service anticipates that many of the other Gallatin II Timber Sale Program sales also will fail to meet the Gallatin Forest Plan's standards for road density, and it expects that they, too, will require site-specific amendments to the plan's road density standard. At the time the parties filed their briefs, two of the remaining eleven or so sales (in addition to Darroch–Eagle) had final Decision Notices published, and both included a road density standard amendment. All environmental assessments for Gallatin II sales included in the record contain proposals to amend the road density standard.

In July 1999, Bear Creek Council and Native Ecosystems Council filed administrative appeals challenging the Darroch–Eagle timber sale. See 36 C.F.R. Part 215 (2001). The appeals officer denied both appeals and affirmed the Forest Supervisor's decision to go ahead with the sale. The appeals officer's decision constitutes the final administrative determination of the Department of Agriculture.

Bear Creek filed this action in federal district court on November 24, 1999, naming as defendants the Chief of the United States Forest Service, the Supervisor of the Gallatin National Forest, and various other federal officials. Bear Creek alleged in the district court many violations of NEPA, NFMA, and ESA, most of which have been abandoned on appeal. The district court granted the federal defendants' motion for summary judgment in its entirety.

Before this court, plaintiffs continue to challenge two aspects of the Forest Service's approval of the Darroch–Eagle timber sale. First, they argue that the defendants violated NEPA and NFMA by deciding to amend the Forest Plan's road density standard to allow more roads to remain open following the sale than the Forest Plan would otherwise permit. Second, they argue that defendants violated the ESA by failing to consider the presence of a nearby sheep grazing allotment when evaluating the sale's effect on grizzly bears.

## STANDARD OF REVIEW

We review *de novo* the grant of summary judgment. See *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir.2001). Judicial review of agency decisions under NEPA, NFMA, and the ESA is governed by the Administrative Procedure Act ("APA"), which specifies that an agency action may be overturned only where it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998) (applying arbitrary and capricious standard to NEPA and NFMA claims); *Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine*

*Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir.2001) (applying arbitrary and capricious standard to ESA claims).

## DISCUSSION

### I. Timing of NEPA review

NEPA, 42 U.S.C. §§ 4321 *et seq.*, requires the preparation of a detailed environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1994). Federal regulations permit an agency that is planning a major federal action to conduct a less exhaustive Environmental Assessment ("EA") to determine whether the proposed action will "significantly affect" the environment and thus whether an EIS is required. 40 C.F.R. §§ 1501.4(b), 1508.9 (2001). Here, the Forest Service issued an EA for the timber sale in March 1999, which included a brief discussion of the need for a road density amendment. Two months later the Forest Service issued a decision notice approving the sale, as well as a finding that the sale would not significantly affect the environment so as to require an EIS.

■ Plaintiffs challenge the timing of this NEPA review. Specifically, Bear Creek argues that the Forest Service decided to amend the Forest Plan road density standard for the Darroch–Eagle site *before* analyzing the environmental effects of such an amendment under NEPA. If true, the Forest Service violated NEPA, which requires that an assessment "be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.2000) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir.1988)) (internal quotations omit-

ted); *see also* 40 C.F.R. §§ 1501.2, 1502.5 (2001). The Supreme Court has stated that environmental assessments "shall be prepared at the feasibility analysis (go-no go) stage," *Andrus v. Sierra Club*, 442 U.S. 347, 351–52 n. 3, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), and this circuit has interpreted NEPA to require environmental analysis "before any irreversible and irretrievable commitment of resources." *Metcalf*, 214 F.3d at 1143; *see also Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir.1998), *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir.1988). We will uphold the Forest Service's decision not to prepare an EA until March 1999 unless that decision was unreasonable. *See Friends of Southeast's Future*, 153 F.3d at 1062.

As evidence of the Forest Service's predetermination to amend the forest plan, plaintiffs point to a memorandum from Forest Service Transportation Engineer Jonathan Kempff to Forest Service staff regarding the "Treatment of Roads for the BSL [Big Sky Lumber] Timber Sales." This memorandum, sent on August 7, 1998, addressed issues common to several timber sales, including the Darroch–Eagle sale involved here. It states:

> The following criteria are intended to guide each project team in consistently approaching road issues on each BSL timber sale project:
> 1. Travel Management Issues
> Avoid travel management (TM) issues. Each project includes an amendment to exempt it from having to achieve elk habitat effectiveness [HEI] standards of the Forest Plan, page II–18.

Plaintiffs argue that this memorandum evidences a clear decision, predating the relevant EA by seven months, to adopt a road density amendment as part of the Darroch–Eagle sale. At most, however, we read the Kempff memorandum to indi-

cate that the Forest Service contemplated waiving the road density standard for Gallatin II timber sale projects, including the Darroch–Eagle sale involved in this appeal, before conducting the Darroch–Eagle EA. However, such contemplation does not amount to a NEPA violation unless the Kempff memorandum committed the Forest Service to the amendments proposed. *See Metcalf,* 214 F.3d at 1143 ("the issue we must decide here is whether the Federal Defendants prepared the EA too late in the decision-making process, i.e., after making an irreversible and irretrievable commitment of resources"); *Friends of Southeast's Future,* 153 F.3d at 1063.

■ It did not. Nothing in the record indicates that the Forest Service made its final decision on the Darroch–Eagle amendment until after conducting its EA. Put another way, the agency was free to decide *not* to amend the Forest Plan road density standard up until the time it issued its Decision Notice for the Darroch–Eagle timber sale. This contrasts greatly, for example, with the situation faced by this court in *Metcalf,* in which NEPA review was held to be untimely. *See Metcalf,* 214 F.3d at 1145. There, the government defendants had signed binding contracts committing project resources before evaluating the project's environmental effects under NEPA. Such a commitment, the court held, hampered NEPA's purpose and prevented the agency from taking the requisite hard look at the environmental consequences of its action. *Id.* Here, by contrast, the EA served its intended purposes: to force the Forest Service to confront (and to publicize) the environmental consequences of its plan before committing to it.

We affirm the district court on this issue.

## II. Cumulative effects under NEPA

Plaintiffs argue that the Forest Service violated NEPA by failing to consider the cumulative effects of its multiple decisions to waive road density standards for most, or all, Gallatin II Timber Sale Program sales. This argument may be understood to encompass two objections. *See Kleppe v. Sierra Club,* 427 U.S. 390, 408–09, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). First, it amounts to an attack upon the decision of the Forest Service not to prepare one comprehensive environmental review for all road density amendments in the Gallatin Forest proposed under the Gallatin II Timber Sale Program. Second, the argument may be interpreted as a challenge to the sufficiency of the EA prepared by the Forest Service for the Darroch–Eagle sale.

### A. Necessity of a Comprehensive Environmental Review

NEPA requires the Forest Service to prepare an EA to determine whether its proposed action will have a significant effect on the environment. *See* 40 C.F.R. § 1501.4 (2001); *Metcalf,* 214 F.3d at 1142. If the EA reveals that the proposed action will significantly affect the environment, the agency must prepare an EIS. *See* 40 C.F.R. §§ 1501.4, 1508.9 (2001). Here, the Forest Service prepared an EA for the Darroch–Eagle timber sale alone and concluded that the sale would not significantly affect the environment.

■ Plaintiffs argue that the Forest Service was required to issue one comprehensive environmental review document considering, in a coordinated fashion, whether to go forward with all Gallatin II road density amendments. A single NEPA review document is required for distinct projects when there is a single proposal governing the projects, *see Kleppe,* 427 U.S. at 399, 96 S.Ct. 2718, or when the projects are "connected," "cumu-

lative," or "similar" actions under the regulations implementing NEPA. *See* 40 C.F.R. § 1508.25 (2001) ;[1] *see also Kleppe,* 427 U.S. at 410, 96 S.Ct. 2718.

■ Here, as discussed above with respect to the Kempff memorandum, *supra* at pp. 892–93, there is no Gallatin II-wide proposal to amend road density standards; rather, each timber sale proposal includes its own recommendation to amend the standard, which is evaluated on a sale-by-sale basis in each EA. Though the sales are related in a broad sense, with each contributing money toward the purchase of private lands under the land consolidation program crafted by Congress, each sale is conducted separately and each may go forward without the others. The Forest Service's decision to treat the amendments as part of separate proposals was not arbitrary.

■ Plaintiffs can nonetheless prevail on their claim that the Forest Service should have issued a single EA or EIS for all Gallatin II road density amendments if they can show that such amendments are connected, cumulative, or similar actions under 40 C.F.R. § 1508.25. *See Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1118 (9th Cir.2000). Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative, and similar actions must be considered together to prevent an agency from "dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.*

(quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985)).

To prevail, plaintiffs must show that the Forest Service was arbitrary and capricious in failing to prepare one comprehensive environmental statement. *Kleppe,* 427 U.S. at 412, 96 S.Ct. 2718. The Supreme Court has emphasized that:

> The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.

*Id.* (citation omitted).

■■ We apply an "independent utility" test to determine whether multiple actions are connected so as to require an agency to consider them in a single NEPA review. *Wetlands Action Network,* 222 F.3d at 1118. Where each of two projects would have taken place with or without the other, each has "independent utility" and the two are not considered connected actions. *Id.* Here, each Gallatin II timber sale has independent utility in that each contributes separately to the fund established by Congress to purchase private lands, and each will go forward without the others. Thus, the timber sales (and, *perforce,* the timber sale amendments) do not

---

1. We rely on NEPA regulations, promulgated by the Council on Environmental Quality ("CEQ"), to guide our review of an agency's compliance with NEPA. *See Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998) (*"Blue Mountain"*); *see also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 372, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (holding that CEQ regulations are entitled to substantial deference).

meet this circuit's test for "connected actions."

Whether the timber sale amendments should be considered "cumulative actions" under the regulations is a closer call. Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (2001). This Court has required the Forest Service to analyze five distinct timber sales in a single NEPA analysis where the five sales were located in the same watershed, were part of a single timber salvage project, were announced simultaneously, and were reasonably foreseeable. *Blue Mountains,* 161 F.3d at 1215 (9th Cir.1998). In doing so, we held that the sales "raise substantial questions that they will result in significant environmental impacts." *Id.*

Here, we emphasize that the actions purportedly required to be analyzed together in this case are not the Gallatin II sales themselves, but the road density waivers that plaintiffs foresee being adopted in connection with each sale. As discussed above with respect to the Kempff memorandum, the road density amendments are not governed by a single proposal. The Forest Service will make the decision to adopt each amendment separately, over a period of time, not together as were the *Blue Mountains* timber salvage sales decisions. *See id.* at 1215 ("all five sales were disclosed by name to a coalition of logging companies, along with estimated sale quantities and timelines even before the ... EA was completed"). Nothing in the record suggests that the Forest Service's goal was to segment review of the road density amendments so as to minimize their seeming cumulative impact. *See Churchill County v. Norton,* 276 F.3d 1060, 1079 (9th Cir.2001). We cannot say, on the record before us, that the series of road density amendments are

cumulative actions under Section 1508.25(a)(2) so as to require their consideration together in a single NEPA review document.

## B. Sufficiency of the EA

As discussed above, NEPA does not require that federal agencies always evaluate the feasibility of separate proposed projects in a single, comprehensive EIS. In contrast, NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with "past, present and reasonably foreseeable future actions." *See* 40 C.F.R. §§ 1508.7, 1508.25, 1508.27(b)(7) (2001); *Hall v. Norton,* 266 F.3d 969, 978 (9th Cir.2001); *Kern v. United States Bureau of Land Management,* 284 F.3d 1062, 1075–76 (9th Cir.2002). Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, or *reasonably foreseeable future actions.*" 40 C.F.R. §§ 1508.7 (2001) (emphasis added). CEQ regulations specifically admonish agencies that cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

We have recognized that even EAs, the less comprehensive of the two environmental reports envisioned by NEPA, must in some circumstances include an analysis of the cumulative impacts of a project. *See Kern,* 284 F.3d at 1078; 40 C.F.R. § 1508.9(a) (2001). An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* at § 1508.9(b). An EA may be deficient if it fails to include a cumulative impact analysis or to

tier to an EIS that reflects such an analysis. *See Kern,* 284 F.3d at 1077; *Hall v. Norton,* 266 F.3d at 978; *Blue Mountains,* 161 F.3d at 1214; *Idaho Sporting Congress,* 137 F.3d at 1152 (9th Cir.1998).

The importance of ensuring that EAs consider the additive effect of many incremental environmental encroachments is clear. "[I]n a typical year, 45,000 EAs are prepared compared to 450 EISs.... Given that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully.*" *Kern,* 284 F.3d at 1076 (emphasis in original) (quoting Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* at 4, January 1997). As we have previously emphasized when considering the sufficiency of a timber sale EA, without a consideration of individually minor but cumulatively significant effects "it would be easy to underestimate the cumulative impacts of the timber sales ..., and of other reasonably foreseeable future actions, on the [environment]." *Id.* at 1078.

■ Here, the EA for the Darroch–Eagle sale does contain a section discussing the cumulative effects of some reasonably foreseeable future actions to be taken in the area around the sale. It does not, however, include the other Gallatin II road density amendments among these reasonably foreseeable future actions. As a result, the Forest Service does not analyze what, if any, environmental impacts the Darroch–Eagle road density amendment might have in combination with the contemplated road density amendments in the other Gallatin II sales. This omission violates NEPA.[2]

The future road amendments are certainly "reasonably foreseeable" within the meaning of 40 C.F.R. § 1508.7, as illustrated by the Kempff memorandum and the various amendment proposals in the record. The Kempff memorandum evidences a decision to consider these amendments seriously with each Gallatin II timber sale. The Forest Service repeatedly acknowledges in the record that many road density amendments will be required to implement the Gallatin II timber sales, and the record contains several of these proposals.

Moreover, the road density amendments may have cumulative impacts. All of the

---

**2.** The dissent argues that we reach irreconcilable results when we conclude, first, that the Forest Service need not have prepared a comprehensive EIS for all Gallatin II road density waivers because the waivers are not cumulative actions, and second, that the EA prepared for Darroch–Eagle was insufficient for not considering the cumulative impact of the waivers. But "[t]he obligation to wrap several cumulative action proposals into one EIS for decision making purposes is separate and distinct from the requirement to consider in the environmental review of one particular proposal, the cumulative impact of that one proposal when taken together with other proposed or reasonably foreseeable actions." Terence L. Thatcher, *"Understanding Interdependence in the Natural Environment: Some Thoughts on Cumulative Impact Assessment under the National Environmental Policy Act,"* 20 Envtl L. 611, 633 (1990). Section 1508.25(a)(2) requires the former, necessitat-

ing the coordinated analysis of proposals that "have cumulatively significant impacts." In part because the Forest Service has never considered the cumulative impacts of the road density waivers, we cannot determine on the record before us that this requirement has been triggered. In contrast, section 1508.25(c)(3) requires the latter, namely, an analysis of the cumulative impact of the Darroch–Eagle waiver together with reasonably foreseeable future waivers. A cumulative impacts analysis is required even absent a finding that the waivers are likely to have cumulatively significant effects; its purpose, rather, is to determine whether this is so. Though we cannot say that the proposed waivers in this case will have cumulatively significant effects sufficient to require a comprehensive EIS, they are certainly reasonably foreseeable and implicate the possibility of cumulative impacts in the forest sufficiently to trigger this latter NEPA requirement.

sales are proposed to occur within the next two years or so, in order to comply with a December 31, 2003, deadline for providing funds for the purchase of land under the Gallatin Land Consolidation Act. All are proposed for the same national forest and will effect separate but additive changes to the density of roads within that geographic area. Because the amendments are reasonably foreseeable and may have cumulative impacts within the Gallatin National Forest, the Forest Service has a duty to consider them in its analysis of impacts within the Darroch–Eagle EA. *See* 40 C.F.R. §§ 1508.25, 1508.7 (2001); *Kern,* 284 F.3d at 1078–79 (requiring the BLM to consider all "reasonably foreseeable future actions" with an impact on the resource being managed, including future timber sales proposed within the same district, as part of a cumulative impacts analysis within an EA); *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1313 (9th Cir.1990) (granting a preliminary injunction halting logging because the Forest Service failed to analyze the cumulative impacts of a proposed timber sale together with four other proposed sales within the Tongass National Forest).

The Forest Service argues that it need not consider the other road density amendments within the Darroch–Eagle EA because the amendments are spread throughout the Gallatin National Forest. We disagree. The national forest was the geographic unit within which the Forest Service chose to set forth binding road density standards in the Forest Plan. All of these sales are proposed within the Gallatin National Forest and will necessar-

ily have additive effects within that management unit. Unless the cumulative impacts of these amendments are subject to analysis *even though distantly spaced throughout the Forest,* the Forest Service will be free to amend road density standards throughout the forest piecemeal, without ever having to evaluate the amendments' cumulative environmental impacts. NEPA does not permit this, but rather requires the assessment of the cumulative impact of "individually minor but collectively significant actions taking place over a period of time."[3] 40 C.F.R. § 1508.7 (2001).

NEPA requires an EA that analyzes the cumulative impacts of all reasonably foreseeable future road density amendments in the Gallatin National Forest. We therefore hold that the district court erred in granting summary judgment to defendants on this claim.

### III. NFMA

NFMA, 16 U.S.C. §§ 1600 *et seq.,* governs the management of our national forests. It provides a two-step process for forest planning. *See Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1376 (9th Cir.1998) ("Neighbors"). First, the Forest Service must develop a Land Resources Management Plan (also known as a forest plan) for all national forest lands. *Id.;* 36 C.F.R. § 219.10(a) (1996). Implementation of the forest plan then occurs at the site-specific level. Activities in the forest, including timber sales, must be determined to be consistent with the governing forest plan. 16 U.S.C. § 1604(i) (2000). Through both

---

**3.** The Forest Service also argues that its adoption of the road density waiver does no more than maintain the status quo of road density on the timber sale site, and that NEPA documentation is not required for actions that lack any physical impact on the environment. We reject this argument as it ignores the fact that,

absent the road density waiver, the Forest Service would be required to close nine to eleven miles of road following the timber sale. The adoption of the amendment will have physical environmental effects, which must be analyzed in any environmental review of the proposed action.

steps in this process, NFMA imposes substantive constraints on the management of forest lands, such as the need to insure biological diversity. *See Neighbors,* 137 F.3d at 1376; 36 C.F.R. § 219, *et seq.* (2001).

A forest plan was prepared for the Gallatin National Forest in 1987. The plan sets forth a substantive road density requirement (expressed as an HEI standard), *see* supra at pages 890–91, among other standards. Because the Darroch–Eagle sale will not comply with the Forest Plan's road density requirement as discussed above, the Forest Service opted to amend the Forest Plan's road density standard for the Darroch–Eagle site. David Garber, Supervisor for the Gallatin National Forest, explained the need for the amendment in the decision notice for the Darroch–Eagle sale:

> To bring the [Darroch–Eagle sale] drainages into full compliance with the Forest Plan standard, about 9–11 miles of existing road would have to be closed to motorized use. I don't believe this level of closure is necessary nor is it a reasonable requirement for a single timber sale entry. Therefore, I have decided to amend the Forest Plan to exempt this timber harvest project from having to achieve an elk effective cover standard (HEI) of 70%.

Under NFMA, the Forest Service may amend a Forest Plan "in any manner whatsoever," 16 U.S.C. § 1604(f)(4), but any Forest Plan amendment that would result in a "significant change" in the plan requires the preparation of an EIS. *See* 16 U.S.C. § 1604(f)(4) (2000). Significance is determined "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan." 36 C.F.R. § 219.10(f) (1996). Here, the Forest Service concluded that the amendment to the road density standard was not significant. It therefore

did not prepare an EIS for either the single Darroch–Eagle amendment, or for the collective road density amendments required to implement the Gallatin II Timber Program sales.

Plaintiffs challenge the process by which this Forest Plan amendment was adopted, arguing that the Forest Service's piecemeal approach to amending the Forest Plan's road density requirements violates NFMA. Specifically, they assert that the Forest Service violated the NFMA in two ways: (1) by deciding to waive the road density standard before analyzing whether the waiver would effect a "significant" change in the Forest Plan; and (2) by failing to prepare an EIS for the amendment, because when considered together the amendments required for all Gallatin II sales would work a "significant" change on the Forest Plan.

## A. *Exhaustion of administrative remedies*

The Forest Service asserts that neither plaintiff raised these issues in its administrative appeal and that the issues therefore cannot be raised now. Plaintiffs do not dispute that they were required to exhaust their remedies, but argue that they did raise these issues before the agency.

We agree that plaintiffs presented a much less refined legal argument in their administrative appeal. Specifically, plaintiffs never argued that the proposed Forest Plan amendments would change the Forest Plan so significantly as to require the preparation of an EIS under 16 U.S.C. § 1604(f)(4). They also never suggested that the Forest Service should have considered the significance of all Gallatin II road density amendments together when assessing the need for an EIS under NFMA (although they did suggest that cumulative effects must be considered under NEPA).

A fair reading of the administrative appeals, however, reveals that plaintiffs objected generally to the road density amendment, as well as to the process by which the Forest Service decided to adopt it. Plaintiffs asserted that this process violated NFMA. Native Ecosystems Council objected that the sale violated NFMA's requirement that timber sales comply with the Forest Plan, and further argued that the sale wrongly ignored Forest Plan standards (including the road density standard). Native Ecosystems Council also argued that the Forest Service had violated NFMA's procedures for addressing non-significant Forest Plan amendments.[4] In the section of its administrative appeal focusing on violations of NFMA, Bear Creek Council argued (without mentioning the road density amendments specifically) that the proposed timber sale would result in too much open space, making it too easy to hunt migrating elk, in violation of NFMA.

Whether plaintiffs exhausted their administrative remedies on their NFMA claims depends on how broadly we define the requirement that an issue be raised to the agency first. *See* 5 U.S.C. § 704 (2000) (setting forth the APA's exhaustion requirement); 7 U.S.C. § 6912(e) (2000) (setting forth a requirement that plaintiffs "exhaust all administrative appeal procedures established by the Secretary or required by law" before bringing an action in court against the Secretary of Agriculture); 36 C.F.R. Part 215 (2001) (establishing Forest Service appeal procedures). The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged. *See Washington Trout v. McCain Foods*, 45 F.3d 1351, 1354 (9th Cir.1995) (describing exhaustion standard under Clean Water Act); *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 521–22 (9th Cir. 1998) (describing exhaustion standard under Endangered Species Act). In the context of objections to a Forest Service plan based on NFMA, the Third Circuit has held that "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Kleissler v. United States Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999).

Here, the administrative decisionmaker understood plaintiffs to raise the issue of whether the Forest Service complied with NFMA in amending the Forest Plan road density standards, and it addressed this concern in its decision. In answering this charge, the administrative decisionmaker described proper amendment procedures and concluded that the "Forest Service followed the appropriate procedure for amending the Forest Plan."

 Because plaintiffs raised the issue of Forest Plan amendment procedures sufficiently for the agency to review these procedures and to conclude that the Forest Service complied with NFMA, we hold that the plaintiffs exhausted their adminis-

---

**4.** Plaintiffs argued in their administrative appeal that under NFMA, "If the change resulting from a Forest Plan amendment is determined not to be significant for the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures. However, the NEPA was not followed in the agency's amendment of the existing Forest Plan." Before this Court, by contrast, plaintiffs argue that the Forest Service violated NFMA's procedures for addressing significant amendments.

trative remedies as to the issues they raise before us. This result comports with the purposes of the exhaustion requirement of avoiding premature claims and ensuring that the agency be given a chance to bring its expertise to bear to resolve a claim. *See Saulsbury Orchards & Almond Processing, Inc. v. Yeutter*, 917 F.2d 1190, 1195 (9th Cir.1990). Requiring more might unduly burden those who pursue administrative appeals unrepresented by counsel, who may frame their claims in non-legal terms rather than precise legal formulations.

### B. Merits of NFMA claim

■ We affirm the district court with respect to Bear Creek's NFMA claims. First, with respect to timing: Plaintiffs point only to the Kempff memorandum of August 1998, discussed *supra* at pages 892–93, to argue that the Forest Service decided to amend the road density standard before assessing the significance of such an amendment under NFMA. As discussed above in the context of NEPA review, however, the Kempff memorandum does not show that the Forest Service decided upon any particular course of action with respect to the Darroch–Eagle sale. Instead, the record shows that the Forest Service made its final decision on the Darroch–Eagle amendment only after conducting its EA and issuing a Decision Notice, in which it concluded that the amendment was not significant under NFMA. It therefore followed NFMA's timing requirements.

■ Second, we cannot say that the Forest Service acted arbitrarily in analyzing the Darroch–Eagle road density amendment separately from other Gallatin II Timber Sale Program amendments when assessing its significance under 16 U.S.C. § 1604(f)(4). NFMA does not require a cumulative assessment of the sig-

nificance of all Gallatin II proposed amendments, many of which have not yet been adopted, as far as the record shows. The statute provides that forest plans shall "be amended in any manner whatsoever," and regulations leave to the discretion of the Forest Service the question of whether any given amendment is significant. *See* 36 C.F.R. 219.10(f) (1996). These amendments apply to different timber sales throughout the forest, and plaintiffs do not assert that the timber sales themselves are so related as to be, in truth, one sale. Separate analysis of the amendments, then, seems reasonable.

■ We also find reasonable the Forest Service's conclusion that the Darroch–Eagle amendment was not a "significant" change to the overall Gallatin National Forest Plan. The Forest Service concluded in the Decision Notice that the amendment "does not alter multiple-use goals or objectives for long-term land and resource management, nor significantly change the planned annual outputs for the forest." Given the agency's particular expertise in interpreting its own Forest Plan, we cannot say that this decision was arbitrary and capricious.

### IV. Endangered Species Act

The ESA imposes a strict duty on the Forest Service to ensure that any action it authorizes "is not likely to jeopardize the continued existence of any ... threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2) (2000). To comply with this mandate, the Forest Service must conduct an analysis of any effects that a proposed timber sale may have on certain imperiled species and their habitat. ESA regulations require that "[a] biological assessment shall evaluate the potential effects of the action on listed and proposed species." 50 C.F.R.

§ 402.12 (2001). Regulations further define the scope of the geographic area, or "action area," to be analyzed in a biological assessment ("BA"). The action area must include *all areas to be affected directly or indirectly* by the Federal Action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02 (2001) (emphasis added).

Bear Creek challenges the adequacy of the BA issued to address the effects of the Darroch–Eagle timber sale on grizzly bears, which are listed as threatened under the ESA. Bear Creek argues that the Forest Service and the Fish and Wildlife Service ("FWS") were arbitrary and capricious in delineating the analysis area within which effects of the sale on grizzly bears would be considered.

■■■ Agency decisions under the ESA are governed by the Administrative Procedure Act, which requires an agency action to be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000); *Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir.2001). We will find a BA inadequate, however, where the agency "entirely failed to consider an important aspect of the problem" or to "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Pacific Coast Fed'n*, 265 F.3d at 1034.

There is no dispute that the proposed timber sale site provides especially important habitat for the grizzly bear. The timber sale is located on land that the Forest Service concedes is rated as most important for maintaining grizzly populations, designated Management Situation 1, or "MS1," habitat. According to the BA, MS1 areas "contain grizzly population centers and habitat components needed for the survival and recovery of the species. The probability is very great that major federal activities or programs may directly or indirectly affect the conservation and recovery of the grizzly."

Moreover, the record shows that grizzly bears may be affected by the sale. The Forest Service concludes in its EA that grizzly bears, along with other indicator species, "may be displaced because of their intolerance of human activity and/ or habitat may be physically altered." The EA also concludes that the sale "may modify grizzly bear foraging habitat," which is tantamount to concluding that the sale may displace grizzlies since, according to the BA, "[t]he search for food has a strong influence on grizzly bear movements." In addition, the EA concludes that the timber sale "may affect ungulate ... foraging habitat, and migration/travel routes." Ungulates (species such as elk, mule deer, and moose) provide food for grizzlies, and ungulate movement therefore may indirectly affect bear movement, according to the EA. In sum, the Environmental Assessment and Biological Assessment both indicate that the sale may displace bears by altering where the bears travel to find food.

In analyzing the effects of the sale on the bears as required by the ESA, the Forest Service chose an area known as the Hellroaring/Bear Management Subunit I as the largest geographic area within which effects would be considered. This area extends 16.5 miles in one direction from the project site, but only 1.5 miles to the east. According to the Forest Service, the boundaries of this management area were originally crafted to help analyze and address the effects of motorized access on bear habitat.

■■■ Plaintiffs point out that the eastern boundary of this area stops just short

of a nearby sheep grazing allotment, with the result that the Forest Service's analysis entirely omits the potential effects of the allotment, if any, on bears displaced by the timber sale. The BA itself acknowledges the potential danger that sheep grazing allotments pose to grizzly bears, presumably because bears wander onto the allotments seeking food. "[T]he majority of known and probable deaths of [Yellowstone National Park] grizzlies are clustered around central areas . . . called 'population sinks.' These areas include . . . sheep grazing allotments." Moreover, the EIS issued as part of the NEPA documentation surrounding this particular sheep grazing allotment deemed "significant" the "potential for grizzly bears to be removed or killed due to conflicts with livestock." While it is not our role to assess whatever danger this nearby sheep grazing allotment may pose to bears displaced by the timber sale, we do note that the BA's acknowledgment of this potential danger strengthens our conclusion that the Forest Service acted arbitrarily in failing to justify a choice of analysis area that neatly excludes the nearby allotment.

More fundamentally, plaintiffs point out that nothing in the record suggests that the analysis area chosen coincides with all areas to be affected (directly or indirectly) by the timber sale. We acknowledge that the determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion. *See Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718 (1976). But here, nothing in the record allows us to conclude that the agency complied with its own regulations in choosing the Hellroaring/Bear Management Subunit I as its analysis area. In designating an "action area" for analysis, the agency must consider "all areas to be affected directly or indirectly by the Federal Action and not

merely the immediate area involved in the action." 50 C.F.R. § 402.02 (2001). There is no indication in the record that the Forest Service considered which areas would actually be affected by the sale (by determining, for instance, where displaced bears might wander).

Importantly, nothing in the record suggests that the Forest Service attempted to correlate this analysis area with the requirements of an "action area" under § 402.02. The BA contains no discussion of scientific methodology, relevant facts, or rational connections linking the project's potential impacts with the Management Subunit's boundaries. For example, the Forest Service does not discuss or justify its decision to restrict its analysis to within this area despite the fact that the proposed timber sale will occur very near the eastern border of the Management Subunit. It also does not mention the sheep grazing allotment. Its decision to restrict its analysis to this area is presented as a conclusion, without support.

We emphasize that the Management Subunit may well be a proper proxy for the project's action area, but one cannot tell this from the administrative record. An agency must provide support for its choice of analysis area and must show that it considered the relevant factors, *see Pacific Coast Fed'n*, 265 F.3d at 1034, 1035–36, and the Forest Service failed to do so here. Because the Forest Service provides no evidence in the record that this area coincides with the "action area" required to be analyzed under the ESA and regulations, we reverse. *See id.; see also Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121, 128–29 (D.D.C.2001). We hold that, because the Forest Service's BA was inadequate in this respect, the district court erred in granting summary judg-

ment to defendants on this claim.[5]

## CONCLUSION

For the foregoing reasons, we AFFIRM in part and REVERSE in part the district court's grant of summary judgment. We direct the district court to enter a judgment consistent with this opinion and to enjoin the road construction and timber harvesting associated with the Darroch–Eagle timber sale until the Forest Service complies with NEPA and the ESA. The temporary injunction that this court issued on July 2, 2002, shall remain in place until the district court's injunction takes effect.

AFFIRMED IN PART, REVERSED IN PART.

DAVID R. THOMPSON, J., Concurring in part and dissenting in part:

I agree with the majority that the Forest Service was not required to prepare a single EIS evaluating the cumulative impact of the proposed road density amendment for the Darroch–Eagle sale in conjunction with the potential similar amendments for the other Gallatin II timber sales. I do not agree, however, that the Forest Service acted arbitrarily and capriciously in limiting the scope of its cumulative impact analysis for the Darroch–Eagle EA to the Darroch Creek, Bear Creek, and North Fork Bear Creek drainages within the Bear Creek watershed northeast of Gardiner, Montana. Thus, I respectfully dissent from Part II.B of the opinion that requires a NEPA analysis of all reasonably foreseeable road density amendments throughout the Gallatin National Forest.

As explained by the Supreme Court in *Kleppe v. Sierra Club*, 427 U.S. 390, 96

S.Ct. 2718, 49 L.Ed.2d 576 (1976), "absent a showing of arbitrary action" we leave to the Forest Service the determination of the geographic region within which a cumulative impacts analysis is required. *Id.* at 412, 96 S.Ct. 2718. Our prior opinions have uniformly limited the scope of a cumulative impact analysis to "relevant past projects *in the area.*" *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800, 809–10 (9th Cir.1999) (quoting *City of Carmel–by–the–Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir.1997)) (emphasis added). For example, in *Muckleshoot*, we considered whether the Forest Service should have analyzed the cumulative impact of all logging projects in a particular watershed. *Muckleshoot*, 177 F.3d at 810. Similarly, in *Blue Mountains*, we determined that the Forest Service should have considered the cumulative impact of potential logging projects in the same watershed. *Blue Mountains*, 161 F.3d at 1214–15. Finally, in *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1378–79 (9th Cir.1998), we required the Forest Service to analyze the cumulative impact of three additional timber sales within the Cuddy Mountain Roadless Area within the Payette National Forest. Even where we have required analysis of cumulative impacts outside the particular geographic region of the proposed action, we have limited that analysis to the geographic range of the affected resource. *Kern v. Bureau of Land Management*, 284 F.3d 1062, 1079 (9th Cir.2002) (holding that cumulative impact analysis must include "reasonably foreseeable future actions" outside the geographic area but within the range of the Port Orford Cedar, the affected resource at issue).

---

5. Because we hold that the BA was inadequate under the ESA, we do not reach Bear Creek's contention that the Forest Service violated the ESA by failing to reinitiate consultation after learning of bear-sheep conflicts on the allotment in the summer of 1999.

The only rationale offered by the majority in choosing the entire Gallatin National Forest as the geographic scope of the cumulative impacts analysis for the road density waivers is that the road density standards are set forth within the Forest Plan. Under this rationale, however, the Forest Service would uniformly be required to conduct a forest-wide cumulative impact analysis of any proposed site-specific amendment to a Forest Plan standard. In fact, under the majority's rationale, if the Forest Service is aware of other proposed road density amendments within the Gallatin National Forest, unrelated to the Gallatin II project, the Forest Service would be required to include those potential amendments in the Darroch–Eagle cumulative impact analysis, regardless of their relationship to the current proposed action.

The majority also does not cite to anything in the record indicating that the geographic range of the affected resources in this case (grizzly bears and ungulates) would be the entire Gallatin National Forest. In fact, the majority does not discuss any of the factors relevant to the proper choice of geographic scope for environmental analysis. *See* Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act,* January 1997, at 15 (*available at* http://ceq.eh.doe.gov/nepa/ccenepa/ccenepa.htm) (discussing factors relevant to choice of geographic scope for environmental analysis of cumulative impacts). The Forest Service identified and analyzed the potential cumulative impact of past, present, and future actions within the Darroch Creek, Bear Creek, and North Fork Bear Creek drainages, within the Bear Creek watershed northeast of Gardiner, Montana. I do not believe the plaintiffs (or the majority) have adequately explained why the Forest Service's choice of this geographic scope was arbitrary and capricious. Thus, I would affirm the district court's summary judgment on plaintiffs' NEPA claim.