### Erik BARNES, et al.

v.

### Bruce BABBITT, et al.

Nos. CIV. 00–CV–581, CIV. 00–1014–PHX, CIV. 02–1019–JD.

United States District Court, D. Arizona.

July 20, 2004.

---

Thomas K. Kelly, Esq, Carrie Ann Kelly, Thomas K. Kelly PC, Prescott, AZ, for Plaintiffs.

Joseph M. Feller, Tempe, AZ, Thomas D. Lustig, National Wildlife Federation, for plaintiff National Wildlife Federation.

Richard Glenn Patrick, Esq, U.S. Attorney's Office, Phoenix, AZ, for Defendants.

## ORDER

DICLERICO, District Judge.

Plaintiffs National Wildlife Federation, Arizona Wildlife Federation, Maricopa Audubon Society, Sierra Club, and The Wilderness Society ("Environmental Plaintiffs") brought suit against the United States Bureau of Land Management ("BLM") challenging two decisions pertaining to the Arrastra Mountain Wilderness. Erik and Tina Barnes, who own land affected by the decisions, brought suit against the Secretary of the Department of the Interior, and two BLM officials.[1] The cases have been consolidated. All of the parties move for summary judgment based on a stipulated record.

---

1. Because the claims are brought against the named individuals in their official capacities only and because the individuals named may no longer hold office, the claims are deemed to be brought against the entities. *See Ken-*

## Background[2]

The Arrastra Mountain Wilderness is located in west central Arizona and encompasses approximately 126,760 acres in Mojave, Yavapai, and La Paz Counties. The Arrastra Mountain Wilderness was designated by the Arizona Desert Wilderness Act of 1990 ("ADWA"), on November 28, 1990. Pub.L. No. 101–628, 104 Stat. 4469, § 101(a)(8). Except for some mining claims and private inholding parcels, the Wilderness is federal public land managed by the BLM. When the Wilderness was designated in 1990, the BLM closed the area to motorized vehicles.

Portions of five grazing allotments are located within the Wilderness. The Wilderness encompasses diverse plant and animal life, including an area where saguaro cactuses of the Sonoran Desert and Joshua trees of the Mojave Desert grow together. In addition, Peeples Canyon, a five-mile deep canyon desert oasis with perennial springs, waterfalls, rock formations, and riparian habitat, is included within the Wilderness.[3]

Erik and Tina Barnes, with their partners, bought the Santa Maria Ranch in Yavapai County, Arizona, in June of 1990 for $350,000. The Ranch consists of 1000 acres near the Arrastra Mountain Wilderness and a forty-acre private inholding parcel in Peeples Canyon. The Barneses also hold grazing rights on land owned by the BLM and the State of Arizona known as the Santa Maria Allotment.

There are no buildings in Peeples Canyon. Except for the Barneses' forty-acre private inholding, which is located at the

bottom of the Canyon, the rest of the Canyon is federal public land. Cattle are excluded from the Canyon to preserve the water quality in Peeples Canyon Spring and the stream that runs it.[4] The stream has been designated a "unique water" by the State of Arizona for purposes of the Clean Water Act. A jeep access to the private inholding was bulldozed across property that was owned by the State of Arizona out to the highway in 1940. In the 1960s, the owners of the inholding tore up the access to make it impassable to ordinary four-wheel-drive vehicles. Subsequent owners repaired the access, but after 1980, the access down from the Canyon rim became eroded and was not repaired. Before the Barneses acquired the inholding, the previous owner accessed the inholding from the Canyon rim by foot or horseback.

The inholding was historically used as a site for a gasoline-powered pump to supply water to tanks, located outside of the Canyon, that provided water for grazing livestock. The pump stopped functioning in 1980 and was removed in 1990. All livestock operations stopped on the Santa Maria Ranch four or five years before the Barneses bought it in 1990.

After buying the Ranch in June of 1990, the Barneses applied to the BLM to activate grazing on the Santa Maria grazing allotment, seeking permission for 240 head of cattle. In response to the application, the BLM issued notice of a proposed decision in September of 1990. The Environmental Plaintiffs filed a protest, and the BLM issued a draft environmental assessment for the proposal on March 15, 1991.

---

*tucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

**2.** The parties provided a statement of stipulated facts from which the background information is taken.

**3.** The parties note that "Peeples" is also spelled "Peoples" but agree that "Peeples" is the proper spelling.

**4.** Peeples Canyon Spring is also referred to as South Peeples Spring.

On May 31, 1991, the BLM issued a final Environmental Assessment ("EA") for the Barneses' proposal for livestock grazing, AZ–026–91–14, ("Grazing EA"). The Grazing EA considered three alternative actions: grazing as proposed by the Barneses, grazing in a reduced format, and no action. It concluded that the Barneses' grazing proposal, with certain stipulations, would have no environmental impact.

In October of 1993, the BLM issued a draft Range Improvement Plan and Environmental Assessment of the grazing allotments in the area for public comment. The final Range Improvement Plan and Environmental Assessment ("RIM Plan EA"), AZ–026–92–0111, was issued in July of 1996. The purpose of the RIM Plan EA was to provide "direction for the management of ongoing livestock grazing operations and maintenance of the range improvements in the Arrastra Mountain Wilderness on grazing allotments administered by the Lower Gila Resource Area." Ex. V, RIM Plan EA at 5. The RIM Plan EA considered two alternatives: "Limited Motorized/Mechanized Use Alternative (Proposed Action)" and "No Motorized Mechanized Use Alternative (No Action)." *Id.* at 11 & 27. The RIM Plan EA addressed the repair and maintenance of all "historically maintained" range developments, not just those that were then operational, and did not consider an alternative for fewer than all of the water facilities. *Id.* at 5 & 28.

Along with the RIM Plan EA, the BLM issued a decision ("RIM Plan Decision") that adopted the proposed action alternative. As such, the RIM Plan Decision authorized the use, within certain limits, of motor vehicles and mechanized equipment to restore and maintain water developments and vehicle routes within the Wilderness. With respect to access into the Barneses' inholding in Peeples Canyon, the RIM Plan Decision authorized mechanized development of the access route to permit a four-wheel-drive pickup truck to pass from the Wilderness boundary to the rim of the Canyon. The vehicle routes, including the access to the Barneses' inholding, would be repaired, maintained, and used only as necessary for maintaining the grazing developments.

A third environmental assessment, AZ–026–94–23, Wilderness Inholding Access, Arrastra Mountain Wilderness ("Access EA"), issued in December of 1996, addressed only the access route to the Barneses' inholding.[5] The Access EA was preceded by a draft for public comment issued in June of 1994. The Access EA analyzed three alternatives for different levels of repair or improvement and maintenance for vehicle access and one alternative for no action, which would prevent vehicle access. The Access Decision, issued at the same time, authorized repairs of the access route that would allow passage of a four-wheel-drive pickup truck and certain other motorized vehicles but only for limited purposes.

In 1995, during the process of assessing the environmental impact of grazing, range improvement, and access to the Barneses' inholding, the BLM met with Erik Barnes to discuss the possibility of federal acquisition of the inholding through a land exchange. On May 8, 1995, the BLM sent a letter that reported it "could justify an exchange value of approximately $200,000.00" for the Peeples Canyon inholding and the Barneses' grazing rights

---

5. The Access EA appears to address the entire access route along a 2.4 mile jeep trail and down into the Canyon to the inholding. If so, the RIM Plan Decision and the Access Decision overlap as to the portion of the access route across the wilderness area to the rim of the Canyon.

in the Wilderness. Ex. A, subex. D. The letter concluded that "[t]his administratively established value is submitted for your consideration but may be modified or withdrawn at any time without notice." *Id.* Erik Barnes responded on May 25, 1995, that they were "disappointed with the $200,000 offer." *Id.* He suggested instead a long-term lease, stated that he hoped they were still negotiating in good faith, and also noted that time was important to them. *Id.* at subex. E. The record includes nothing further about the proposed exchange.

Neither the Barneses nor the Environmental Plaintiffs were satisfied with the BLM's RIM Plan and Access Decisions, issued in 1996, and filed appeals, which were consolidated. The RIM Plan Decision and Access Decision were affirmed by the Interior Board of Land Appeals ("IBLA") in November of 1999. *National Wildlife Federation,* 151 IBLA 104 (1999) (affirming RIM Plan Decision). *Erik & Tina Barnes,* 151 IBLA 128 (1999) (affirming Access Decision). The Barneses filed suit on March 31, 2000, and later filed an amended complaint, seeking a declaratory judgment that the BLM decisions resulted in a taking of their right to motorized access to their inholding in violation of the Fifth and Fourteenth Amendments, seeking to quiet title to a public right of way across the Wilderness land to the inholding, and seeking review of the IBLA decisions under the Administrative Procedure Act. The Environmental Plaintiffs also brought suit and then filed an amended complaint, requesting review of the IBLA decisions and seeking a declaratory judgment that the decisions violate federal law and BLM regulations and an injunction to preclude implementation of the RIM and Access Decisions. The actions were consolidated.

## Discussion

The parties have filed cross motions for summary judgment based on a joint statement of stipulated facts and an agreed compilation of documents from the administrative record. The defendants filed a supplemental administrative record of four documents.[6] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## I. The Barneses' Motion

■ In their motion for summary judgment, the Barneses address only their quiet title claim, brought pursuant to 28 U.S.C. § 2409a.[7] "The Quiet Title Act [28 U.S.C. § 2409a] permits suit against the United States 'to adjudicate a disputed title to real property in which the United States claims an interest.'" *Leisnoi, Inc. v. United States,* 313 F.3d 1181, 1182 (9th Cir.2002) (quoting § 2409a). A complaint bringing an action under § 2409a must "set forth with particularity the nature of

---

6. The defendants state that the BLM Manual, Glossary of Terms, is at Tab X and that it was previously submitted by the Environmental Plaintiffs. Tab X of the defendants' supplement is a copy of the RIM Plan EA. The court has not located the BLM Manual, Glossary of Terms, in the Environmental Plaintiffs' previous filings.

7. The defendants argue that the Barneses have waived their other claims by failing to address those claims in their motion for summary judgment. The cases cited by the defendants, however, are from other circuits and do not support their argument. Instead, claims not addressed both in a party's own motion for summary judgment and in response to her opponent's motion are abandoned. *See* footnote 11, *infra.*

the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." § 2409a(d). As a waiver of sovereign immunity, § 2409a is the exclusive means to challenge the title of the United States to real property. *Block v. North Dakota*, 461 U.S. 273, 286, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *accord Gardner v. Stager*, 103 F.3d 886, 888 (9th Cir. 1996).

■ The Barneses allege in their quiet title claim that the defendants denied them the use and enjoyment of their property by constructing barriers across "a lawfully established roadway" and seek "to quiet title to an existing public right (or rights) of way across public lands to [their] parcel of real property." Am. Comp. at 9. As such, the Barneses' complaint fails to allege with particularity the nature of their claimed right, title, or interest in the access route as is required to maintain a claim under the Quiet Title Act. *See* § 2409a(d). In addition, to the extent the Barneses' claim is premised on the public's right to use the access route, rather than their own right, title, or interest in the access route, they have not alleged a cognizable claim under § 2409a.[8] *See, e.g., Southwest Four Wheel Drive Ass'n v. BLM*, 363 F.3d 1069, 1071 (10th Cir.2004); *Long v. Area Manager, Bureau of Reclamation*, 236 F.3d 910, 915 (8th Cir.2001); *Fairhurst Family Ass'n, LLC v. U.S. Forest Service Dep't of Agric.*, 172 F.Supp.2d 1328, 1331–33 (D.Colo.2001). Therefore,

the claim should have been dismissed on either of those grounds.

In their motion for summary judgment, however, the Barneses present their Quiet Title Act claim more clearly. They ask the court to enter an order quieting title to the route across federal lands within the Arrastra Mountain Wilderness to allow them to use motorized vehicles to access their inholding without any limitation. They claim that they have the right under Arizona law to use the access route either as an "implied way of necessity," or if that is not the case, pursuant to Arizona Revised Statutes § 12–1202, which provides a statutory "private way of necessity." The Environmental Plaintiffs and the defendants oppose the Barneses' motion.[9]

A. *Implied Way of Necessity*

■ "Under the common law, where land is sold that has no outlet, the vendor by implication of the law grants ingress and egress over the parcel to which he retains ownership, enabling the purchaser to have access to his property." *Bickel v. Hansen*, 169 Ariz. 371, 819 P.2d 957, 960 (1991); *accord Tobias v. Dailey*, 196 Ariz. 418, 998 P.2d 1091, 1094 (2000); *see also United States v. Jenks*, 129 F.3d 1348, 1353 (10th Cir.1997). "Establishment of an implied way of necessity is dependent on a unity of ownership of the dominant and servient estates, followed by a severance thereof." *Bickel*, 819 P.2d at 960. Once an implied way of necessity is created, it is appurtenant to the land and passes to each successor. *Tobias*, 998 P.2d at 1094. The party seeking to establish a

---

8. The Ninth Circuit has not directly addressed the question of whether the Quiet Title Act permits claims based on a public right or interest. *See, e.g., Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir.1989) (considering statute of limitations under Quiet Title Act in claim of access to public road).

9. To the extent that the Environmental Plaintiffs argue that state law cannot establish rights or interests for purposes of Quiet Title Act claims, they appear to be mistaken. *See Bunyard v. U.S. Dep't of Agric.*, 301 F.Supp.2d 1052, 1054 (D.Ariz.2004).

way of necessity has the burden of proving the elements of the claim. *See Siemsen v. Davis,* 196 Ariz. 411, 998 P.2d 1084, 1087–88 (2000).

■ The Barneses' forty-acre inholding was first privately owned by Viola McNeil who obtained a patent for the property from the United States in 1936. The Barneses assert in their motion for summary judgment that the unity of ownership that is required for an implied way of necessity existed because the United States has owned the surrounding lands and owns those lands now, although the State of Arizona has also held title to those lands. The Barneses' failure to provide evidence as to the ownership of the lands at the time the patent issued to McNeil is fatal to their claim.[10] *See Bickel,* 819 P.2d at 960; *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In contrast, the defendants provide some evidence, which the Barneses do not dispute, that the State of Arizona obtained equitable title to the lands surrounding the inholding through the process of "indemnity school selection," and that the selection process was complete before November 26, 1934. Indemnity school selection was the means by which a state exchanged lands granted by the United States to establish and maintain public schools under the statehood Enabling Acts for other federal land. *See, e.g., Andrus v. Utah,* 446 U.S. 500, 502–04, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980); *Alamo Land & Cattle Co., Inc. v. Arizona,* 424 U.S. 295, 295–98, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1046 (9th Cir.2003) (citing parts of New Mexico–Arizona Enabling Act pertinent to Ari-

zona as §§ 24–26, 36 U.S. Stat. 557, 568–579 (1910)); *Masayesva v. Zah,* 792 F.Supp. 1172, 1174–75 (D.Ariz.1992). When the selection process was complete and valid, but before the selection was approved, the state obtained equitable title to the selected lands, which vested the state's ownership interests. *Wyoming v. United States,* 255 U.S. 489, 496–98, 41 S.Ct. 393, 65 L.Ed. 742 (1921); *United States v. Shumway,* 199 F.3d 1093, 1102–03 (9th Cir.1999) (discussing property rights in context of application for mining patent).

Therefore, once Arizona validly selected the land surrounding Peeples Canyon in lieu of other lands that had been granted to the state by the United States, the United States retained only bare legal title to those lands while Arizona obtained equitable title with all the rights of ownership. It appears to be undisputed that a valid selection occurred in 1934, before the patent for the inholding in Peeples Canyon was issued to Viola McNeil. Because Arizona owned the surrounding lands, divesting the United States of the unity of ownership necessary to support an implied way of necessity when the patent for the inholding was issued to Viola McNeil, no way of necessity was implied when the patent issued. *See, e.g., United States v. Clarke,* 529 F.2d 984, 986 (9th Cir.1976); *cf.* Restatement (Third) of Property § 2.3 (1998). The Barneses have not carried their burden of proof to show that an implied way of necessity was created when the patent issued to Viola McNeil.

**B.** *Statutory Way of Necessity*

■ In the alternative, the Barneses argue that they are entitled to a private way

---

**10.** Because the Barneses have not provided any evidence that the United States owned the surrounding lands when it conveyed the patent for the inholding to Viola McNeil, it is not necessary to consider the Environmental Plaintiffs' alternative argument that a common law easement cannot be created against the United States.

of necessity pursuant to Arizona Revised Statutes ("A.R.S.") § 12–1202. As the defendants and the Environmental Plaintiffs point out, however, A.R.S. § 12–1202 merely permits the condemnation of lands for a private way of necessity under certain conditions. Because the Barneses have not yet been granted a condemnation of a way across the federal lands, by this court or any other court, they have no existing right or title to an access route across the federal lands to litigate under the Quiet Title Act. Therefore, their Quiet Title Act claim based on A.R.S. § 12–1202 is premature.

■ Even if that were not the case, however, the Barneses have not shown that they are entitled to a condemnation under A.R.S. § 12–1202. In order to establish a right to condemn an access way across federal lands under A.R.S. § 12–1202, the Barneses must first show that no other access exists. *Siemsen*, 998 P.2d at 1087. There is no dispute that an access route exists across the federal lands to the Barneses' inholding. The Barneses challenge the limitations imposed on their use of the route that prevent unrestricted motorized vehicle access. They have not, however, established that the limitations are so restrictive relative to their needs for access as to demonstrate a "reasonable necessity" for unrestricted motorized vehicle access. *See id.*

■ In addition, the Wilderness Act controls the use of the affected federal lands, which are part of the Arrastra Mountain Wilderness. *See* 16 U.S.C. § 1133. Section 1134(a) provides for "adequate access" to in holdings. Therefore, because the Barnes have access to their

inholding and the Wilderness Act provides for access, condemnation under A.R.S. § 12–1202 is not necessary or appropriate. *See Jenks*, 129 F.3d at 1353–54.

The Barneses' motion for summary judgment is denied.

## II. *The Defendants' Motion for Summary Judgment on the Barneses' Claims*

The defendants move for summary judgment in their favor on the Barneses' claims challenging the IBLA decisions and alleging a Fifth Amendment taking. In their objection to the Barneses' motion for summary judgment, the defendants asserted that they were entitled to summary judgment on the Barneses' quiet title claim, and they reiterated that assertion in their reply to the Barneses' objection to their motion for summary judgment. Although the defendants' failure to address the Barneses' quiet title claim in their own motion might in some cases prevent summary judgment in their favor on that claim, here the parties have submitted all claims to be resolved on summary judgment. Therefore, the defendants are deemed to have moved for summary judgment on all three claims. For the reasons stated in the context of the Barneses' motion for summary judgment, the defendants are entitled to summary judgment on the Barneses' quiet title claim.

## A. *Takings Claim*

The Barneses allege that the defendants' actions and decisions restricting their access to their inholding amount to a taking of their property without just compensation in violation of the Fifth Amendment.[11]

---

**11.** As the defendants note, the Barneses also raised other legal grounds for their takings claim but because they have not pursued those theories in either their motion for summary judgment or in response to the defendants' motion, they are deemed to be abandoned. *See, e.g., Lands Council v. Vaught,*

Rather than damages for the alleged taking, they seek equitable relief: that they be allowed unrestricted motorized access to their inholding. The defendants argue that the Barneses are not entitled to equitable relief because they must first seek compensation through available procedures.

The defendants are correct. "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (footnote omitted); *cf. E. Enters. v. Apfel,* 524 U.S. 498, 520–21, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (explaining exception where challenged statute rather than burden on property requires transfer of funds). Despite the Barneses' brief protestations to the contrary, the BLM's actions pursuant to the Wilderness Act fall within *Ruckelshaus. See, e.g., Clouser v. Espy,* 42 F.3d 1522, 1538–39 (9th Cir.1994). Therefore, the court lacks jurisdiction to consider a takings claim seeking equitable relief under the circumstances presented here because the Barneses have not sought compensation under the Tucker Act. *See Bay View, Inc. v. AHTNA, Inc.,* 105 F.3d 1281, 1284–85 (9th Cir.1997). Therefore, the takings claim is dismissed for lack of jurisdiction.

### B. *IBLA Decisions*

The IBLA affirmed the BLM's Access Decision that authorized limited repair, maintenance, and motorized use of the access route to the Barneses' inholding. The IBLA also affirmed the RIM Plan Decision which "authorizes the limited use of motorized and mechanized equipment for repair/maintenance of rangeland facilities along 15.5 miles of access routes." Ex. W. 151 IBLA 106. The Barneses allege that the IBLA decision affirming the Access Decision is "factually inaccurate and contrary to law." Am. Comp. at 7. They allege that the IBLA decision affirming the RIM Plan Decision "unlawfully restricts personal activities on private land within the confines of the wilderness area" and is "arbitrary and capricious." *Id.*

The defendants move for summary judgment on the grounds that the Barneses have no right to access their inholding or their claimed water rights under Revised Statute 2477, as they argued to the IBLA. In response, the Barneses ask that the IBLA decisions be affirmed except for the relief they requested in their own motion for summary judgment. They contend only that under the Wilderness Act, which preserves existing rights, 16 U.S.C. § 1133(c), they are entitled to unrestricted motorized access to their inholding because state law provides either an implied or a statutory way of necessity.

Since the Barneses' claimed rights under state law have been denied, state law does not provide an "existing right" for purposes of § 1133(c). The Barneses have abandoned their other arguments and claims pertaining to a right to unrestricted motorized access across federal lands. *See, e.g., Lands Council,* 198 F.Supp.2d at 1220 n. 1. Therefore, the defendants are entitled to summary judgment on the Barneses' claims.

### III. *The Environmental Plaintiffs' and Defendants' Motions for Summary Judgment on the Environmental Plaintiffs' Claims*

In their amended complaint, the Environmental Plaintiffs assert eight claims

198 F.Supp.2d 1211, 1220 n. 1 (E.D.Wash. 2002).

challenging the IBLA decisions affirming the BLM's RIM Plan Decision and the Access Decision.[12] For purposes of summary judgment, however, the Environmental Plaintiffs have voluntarily withdrawn their claims in Counts V and VI of the amended complaint. They seek a declaratory judgment that the IBLA's decisions affirming BLM's RIM Plan Decision and Access Decision are arbitrary and capricious and contrary to the Wilderness Act, the Arizona Wilderness Act, the National Environmental Policy Act ("NEPA"), and the BLM's Wilderness Regulations. They also seek injunctive relief. The defendants oppose the Environmental Plaintiffs' claims and move for summary judgment to affirm the IBLA decisions.

Judicial review of agency decisions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir.2003), *as amended*, 360 F.3d 1374 (9th Cir.2004). An agency decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "[T]he agency must articulate a rational connection between the facts found and the conclusions made." *Envtl. Def. Ctr., Inc. v. E.P.A.*, 344 F.3d 832, 858 n. 36 (9th Cir. 2003). "[T]he reviewing court may not substitute its judgment for that of the agency." *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Under the APA standard, a decision must be set aside "when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision contrary to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir.2003) (internal quotation marks omitted).

A. *The Wilderness Act and the Arizona Desert Wilderness Act*

"In 1964 Congress passed the Wilderness Act, which established the National Wilderness Preservation System with the explicit statutory purpose 'to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition.'" *Wilderness Soc'y*, 353 F.3d at 1055 (quoting 16 U.S.C. § 1131(a)). "As President Lyndon B. Johnson reportedly said upon signing of the Wilderness Act in 1964, '[i]f future generations are to remember us with gratitude rather than contempt, we must leave them more than the miracles of technology. We must leave them a glimpse of the world as it was in the beginning, not just after we got through with it.'" *Id.* (quoting National Park Service, Grand Canyon National Park Wilderness Management Plan 1–2 (1989), available at http://www.nps.gov/grca/wilderness/documents/ sec-one.pdf.). The ADWA (Arizona Desert Wilderness Act) designated wilderness lands in Arizona, including the Arrastra Mountain Wilderness, "[i]n furtherance of the purposes of the Wilderness Act" and subject to the provisions of the Wilderness Act and the Grazing Guidelines. ADWA of 1990 § 101; *see also* 43 U.S.C. § 1782(c).

---

**12.** The claims are alleged in six counts but Counts I and IV each include two separate claims.

The Environmental Plaintiffs argue that the IBLA decisions affirming the RIM Plan Decision and the Access Decision, which permit limited motorized vehicular access and mechanized reconstruction and maintenance of range improvements, including roads, are contrary to and violate the Wilderness Act and the ADWA. The defendants counter that the Grazing Guidelines and Congress's intent to permit continued grazing on Wilderness lands authorize the RIM Plan Decision and the provisions to secure "valid existing rights" and "adequate access" in the Wilderness Act require the action approved by the Access Decision.

### 1. RIM Plan Decision.

The RIM Plan Decision, as affirmed by the IBLA, "authorizes the limited use of motorized and mechanized equipment for repair/maintenance of rangeland facilities along 15.5 miles of access routes. It permits, on a limited basis, the use of pickups, all-terrain vehicles, chainsaws, etc., by grazing permittees/lessees for maintaining fences, corrals, and water facilities and access routes addressed in the RIM plan." Ex. W, 151 IBLA 106. The RIM Plan Decision also allows the use of backhoes and bulldozers to repair and maintain the access routes.

The access routes are: (1) Sycamore Spring route, four-and-one-half miles; (2) Peeples Canyon Spring route, two-and-one-quarter-miles (to rim of Canyon); (3) Tom's Thicket Trail, one-quarter mile; (4) Valencia Wash, five miles, and (5) Anderson Mine access, one-half mile of old road. Sycamore Spring route, Peeples Canyon Spring route, and Tom's Thicket Trail were originally bulldozed in the early 1940s, with additional parts or spurs added later. Valencia Wash is a "large desert wash," rather than a bulldozed road. Part of the Anderson Mine access was bull-

dozed in the late 1960s, and the remainder is the riverbed of the Santa Maria River. At least parts of each route had been used by some type of motorized vehicle before the wilderness designation in 1990. Because motorized travel was excluded from the routes after the wilderness designation, natural rehabilitation had occurred by 1996 when the RIM Plan Decision was issued. Under the RIM Plan Decision, the access routes are to be used for major maintenance of seventeen range improvements, which are fences, water sources, and corrals within the wilderness area.

As the access routes existed in 1996, certain improvements were necessary to make them passable for four-wheel-drive pickup trucks, as allowed by the RIM Plan Decision. One-half mile of the Sycamore Spring route would have to be "improved" by using a bulldozer or backhoe. The Peeples Canyon route had four impassable spots, totaling 500 feet, that would require work by a bulldozer or backhoe. Tom's Thicket Trail would require cutting thick overgrowth with axes or a chainsaw. Valencia Wash would require moving rocks, logs, or soil, and cutting brush using axes, chainsaws, shovels, and chains. The old road part of the Anderson Mine access would require bulldozer or backhoe work on about 100 feet.

The Environmental Plaintiffs contend that the RIM Plan Decision's authorization of repair and maintenance of the access routes constitutes construction of permanent roads within the Arrastra Mountain Wilderness. They argue that road construction is inconsistent with the Wilderness Act's requirement to preserve the area's wilderness character and its prohibition against roads. The Environmental Plaintiffs further contend that the Grazing Guidelines, incorporated into the ADWA, do not permit construction and maintenance of roads and that the RIM Plan

Decision does not follow the Guidelines for motorized or mechanized uses.

### a. *Wilderness character under the Wilderness Act.*

The Wilderness Act requires the BLM to "preserv[e] the wilderness character of the area and [to] so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b). "Wilderness" is defined in the Wilderness Act as follows:

an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). With respect to the construction and maintenance of roads, the Wilderness Act directs that "[e]xcept as specifically provided for in this chapter, and subject to existing private rights, there shall be ... no permanent road within any wilderness area and, except as necessary to meet minimum requirements for the administration of the area ..., there

shall be no temporary road ...." § 1133(c). BLM regulations in effect in 1996 prohibited temporary or permanent roads and the use of motorized equipment and motor vehicles in wilderness areas, except as otherwise provided in the Wilderness Act. 43 C.F.R. § 8560.1–2(b) & (d).

In the final Wilderness Environmental Impact Statement for the Arrastra Mountain Wilderness area, issued in August of 1987, the BLM characterized the area as being "predominantly natural with negligible human imprints." Ex. N, Final EIS at 110. The BLM noted that the area included ten developed springs, grazing allotment fencing, five corrals, and twenty-seven miles of "vehicle way," but that there was little impact on the area's naturalness. *Id.* All grazing operations were discontinued on the Santa Maria Ranch allotment before 1987.

The IBLA found that the RIM Plan Decision allowed a limited use of motor vehicles or mechanized equipment for the repair and maintenance of seventeen range developments, to respond to emergencies in five grazing allotments, and to periodically repair and maintain five access routes, totaling 15.5 miles. Ex. V, 151 IBLA 109. The IBLA noted the Wilderness Act restrictions on roads in wilderness areas but also noted the statutory and regulatory provisions authorizing the grazing of livestock. *See, e.g.,* 16 U.S.C. § 1133(d)(2); ADWA, § 101(f); 42 C.F.R. § 8560.41 (1996). To support the BLM's decision to authorize repair and maintenance of roads in the Wilderness area and the use of motor vehicles and mechanized equipment, the IBLA found that "the Arrastra Wilderness is not a homogenous area 'where the earth and its community of life are untrammeled by man,' ... but an area interlaced with the imprint of man." Ex. V, 151 IBLA 110 (quoting § 1131(c)). The IBLA concluded that the limited use

of motor vehicles and maintenance of access roads in the area, as allowed by the RIM Plan Decision, would not compromise the wilderness characteristics of the area because those did not exist.

■ In other words, the IBLA concluded that the conditions in the Arrastra Mountain Wilderness do not constitute "wilderness" as defined in the Wilderness Act so that the Act's prohibition against roads does not apply. Since the wilderness designation was determined by Congress, however, the IBLA was without authority to make a contrary determination. In addition, the record does not support the IBLA's conclusion. *See* Ex. L, Draft EIS, at 17; Ex. N, Final EIS, at 25–31. Because the IBLA's decision affirming the RIM Plan Decision was based, at least in part, on a finding that the Arrastra Mountain Wilderness is not a wilderness area as defined by § 1131(c), its decision is contrary to the Wilderness Act and the ADWA and must be set aside.

■ The IBLA also concluded that repair and maintenance of the five access routes does not constitute construction of roads, but merely the repair of existing roads. To qualify as a wilderness area, however, the Arrastra Mountain area must have been "roadless," meaning that it lacked roads that had been improved or maintained by mechanical means for relatively regular and continuous use. *See* 43 U.S.C. § 1782(a); U.S. Dep't of the Interior, BLM, Wilderness Inventory Handbook, at 5, Sept. 27, 1978. An example provided of regular or continuous use is motor vehi-

cle access to maintain established water sources. *Id.* Although the access routes may have been used occasionally by motor vehicles, such as jeeps, before the wilderness designation, there is no evidence that the routes had been improved or maintained for regular or continuous use. The Final EIS for the Arrastra Mountain Wilderness area states that the areas considered for wilderness designation were "roadless." Ex. N, Final EIS at 1. Therefore, the IBLA's conclusion that the area had pre-existing roads is contrary to the evidence and the determination made by Congress in designating the area as wilderness.

The RIM Plan Decision allows grazing permittees to perform limited mechanized route maintenance and to have limited motorized access to range developments for repair and maintenance. Despite the limitations, the anticipated motor vehicle use would be regular and continuous.[13] As such, the access routes, once repaired and in use, would be "roads" within the meaning of the Wilderness Act.[14] Therefore, because the repairs and maintenance of the access routes would constitute road construction in violation of the Wilderness Act, the IBLA's decision must be set aside.

*b. Roads under the Grazing Guidelines.*

■ The ADWA incorporates the Grazing Guidelines that govern grazing in the Wilderness area. ADWA, § 101(a)(f). Livestock grazing and facilities necessary

---

**13.** The Sycamore Spring route would be used between thirteen and twenty-six times each year; the Peeples Canyon Spring route would be used ten to fourteen times, not including trips necessary to access and pump water from South Peeples Spring in the Canyon, and the Tom's Thicket Trail would be used twenty times in a year. Ex. V, RIM Plan at 39, Table 3.

**14.** The statement in the IBLA decision that intrusive activity would be limited to less than one-half of one percent of a given year appears to be based on a misunderstanding of Table 2 in the RIM Plan without consideration of Table 3.

to support livestock are permitted to continue in wilderness areas "when such grazing was established prior to classification of an area as wilderness."[15] Ex. Q, H.R. Rep. 101–405, App. A, Grazing Guidelines, at 41. The Guidelines state: "In summary, subject to the conditions and policies outlined in this report, the general rule of thumb on grazing management in wilderness should be that activities or facilities established prior to the date of an area's designation as wilderness should be allowed to remain in place and may be replaced when necessary for the permittee to properly administer the grazing program." *Id.* at 43.

The Grazing Guidelines neither specifically authorize nor prohibit road construction. The Guidelines allow the construction of new improvements, which are to be "primarily for the purpose of resource protection and the more effective management of these resources rather than to accommodate increased numbers of livestock." *Id.* at 42. The Guidelines also address the need for motorized equipment: "[O]ccasional use of motorized equipment should be permitted where practical alternatives are not available and such use would not have a significant adverse impact on the natural environment." *Id.* Examples of motorized equipment are given as "backhoes to maintain stock ponds, pickup trucks for major fence repairs, or specialized equipment to repair stock watering facilities." *Id.* The occasional use of motorized equipment "should be expressly authorized in the grazing permits for the area involved" and "will normally only be permitted in those portions of a wilderness area where they had occurred prior to the area's designation as wilderness or are established by prior agreement." *Id.*

The Barneses' grazing permit, as part of the Grazing Decision issued in 1991, mentions, but does not authorize, the use of motorized equipment, stating that such uses will be in accordance with a Range Improvement Maintenance Plan (RIM Plan). The 1996 RIM Plan Decision authorizes limited uses of motorized equipment, including backhoes, bulldozers, and pickup trucks. The segmentation of these issues into separate assessments and decisions is addressed in the context of the NEPA claims.

The IBLA decision appears to assume, without discussion, that grazing was established in the Arrastra Mountain Wilderness, within the meaning of the Grazing Guidelines and the Wilderness Act, before September 3, 1964, and continued through 1990 when the area was designated as wilderness. Although the Grazing Decision allowed the Barneses to reactivate grazing operations on the Santa Maria Ranch allotment in 1991, the BLM did not make any clear finding as to whether, when, and to what extent grazing was established on the allotment prior to the designation.[16] The lack of fact-finding and explanation in the RIM Plan Decision to support the level of grazing it authorizes undermines the Decision. Because the Barneses' Grazing Decision does not authorize the use of motorized equipment and the IBLA's decision lacks an explana-

---

**15.** In addition, the Wilderness Act provides that "grazing of livestock, where established prior to September 3, 1964, shall be permitted to continue subject to such reasonable regulations as are deemed necessary by the Secretary of Agriculture." 16 U.S.C. § 1133(d)(4).

**16.** In addition, to confuse matters further, the Grazing Decision is accompanied in the record by a voluntary agreement for non-use of the grazing permitted by the Decision, effective the same day as the Decision. The agreement was for a period of two years and provided for an ecological site inventory by the BLM. Ex. O.

tion as to the factual basis for concluding that use of motorized equipment was established and continued in the Wilderness area during the applicable time period, the Grazing Guidelines do not support the decision.

### 2. The Access Decision.

In the Access Decision, the BLM authorized limited use of motorized and mechanized equipment, meaning bulldozer, truck and/or backhoe, to repair the access route beginning at the rim of Peeples Canyon down into the Canyon to the Barneses' 40–acre inholding.[17] Once repaired, the Barneses would be allowed to use four-wheel-drive pickup trucks or all terrain vehicles over the access route for ranching and recreational purposes. The stated reason for the Decision was to permit the Barneses, as owners of the inholding, to have "adequate access" to their property as required under the Wilderness Act. *See* 16 U.S.C. § 1133(a).

In affirming the Access Decision, the IBLA again found "that the Arrastra Wilderenss is not a homogenous area 'where the earth and its community of life are untrammeled by man,' 16 U.S.C. § 1133(c) (1994), but an area interlaced with the imprint of man." Ex. D, 151 IBLA 140. As discussed above, that justification contradicts Congress's designation of the Arrastra Mountain Wilderness and is not supported by the record. Therefore, to the extent the Access Decision was affirmed based upon the IBLA's revision of the wilderness designation, must be set aside. The IBLA also concluded that the Barneses were entitled to the access route, as approved by the BLM, either as an

"existing private right," which is excepted from the prohibition of roads under the Wilderness Act, 16 U.S.C. § 1133(c), or as "adequate access" under § 1134(a).

#### a. Existing private rights.

Section 1133(c) prohibits roads, among other things, subject to certain exceptions including "existing private rights." The Barneses attempted to establish that they had "existing private rights" to a way across the Wilderness lands to their inholding under United States Revised Statute § 2477, which the IBLA rejected. The IBLA held "there are no facts indicating that the Barnes [sic] are not holders of access rights predating the wilderness designation." Ex. D, 151 IBLA 138. However, in the course of this proceeding the Barneses attempted to prove their claim to private existing rights to the access route but were unable to do so, which eliminates that basis for the Access Decision. Therefore, to the extent the IBLA decision affirmed the Access Decision based on the Barneses' "private existing rights" to the access route, it is contrary to the facts and must be set aside.

#### b. Adequate access.

Section 1134(a) provides: "In any case where ... privately owned land is completely surrounded by national forest lands within areas designated by this chapter as wilderness, such ... private owner shall be given such rights as may be necessary to assure adequate access to such ... privately owned land ... or the ... privately owned land shall be exchanged for federally owned land in the same State of approx-

---

**17.** The court acknowledges some confusion as to the geographical extent of the Access Decision, which is not clear in the Decision itself. The defendants and the IBLA suggest that the Access Decision covers the entire access route across the Wilderness area and down to the inholding. Since the RIM Plan Decision covers the part of the access route across the Wilderness area to the rim of the Canyon, the Access and RIM Plan Decisions overlap as to part of the route.

imately equal value under authorities available to the Secretary of Agriculture." However, the Secretary of Agriculture may "acquire privately owned lands" inside a wilderness area only if the owner concurs in the acquisition or "the acquisition is specifically authorized by Congress." [18] In 1996, when the Access Decision issued, "adequate access" meant "the combination of routes and modes of travel to non-Federal in holdings that will, as determined by the authorized officer, serve the reasonable purposes for which the non-Federal lands are held or used, and at the same time cause impacts of least duration and degree on their wilderness character." 43 C.F.R. § 8560.0–5(a) (1996).

Because the IBLA decision was based at least in part on an improper evaluation of the wilderness character of the area, it relied on a factor which Congress did not intend it to consider and is contrary to the law. In addition, as is discussed below, the process the BLM followed in assessing the purpose for and the environmental impact of the Access Decision also requires that the decision be set aside.

## IV. *National Environmental Protection Act*

"NEPA is our basic national charter for protection of the environment." *Churchill County v. Norton,* 276 F.3d 1060, 1072 (9th Cir.2001) (internal quotation omitted), *as amended,* 282 F.3d 1057 (9th Cir.). NEPA provides a procedural framework for environmental decision-making but does not provide substantive standards for particular results. *See Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1115–16 (9th Cir.2002). The process mandated by NEPA " 'ensure[s] that federal agencies take a hard look at the environmental con-

sequences of their actions.' " *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1071 (9th Cir.2002) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 814 (9th Cir.1999)).

The Environmental Plaintiffs argue that the course of environmental assessments and decisions, beginning with the Grazing EA and Decision in 1991 and continuing with the RIM Plan EA and Access EA and Decisions in 1996, constitute improper segmentation of decision-making in violation of NEPA. The Environmental Plaintiffs also assert that the BLM failed to consider reasonable alternatives, as required under NEPA, for both the RIM Plan and the Access Decision. The defendants argue that the Environmental Plaintiffs' challenges are time-barred and that the decisions of the IBLA should be affirmed.

### A. *Statute of Limitations*

Civil actions against the United States, including actions under the APA, "shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States,* 946 F.2d 710, 713 (9th Cir.1991); *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988). A claim under the APA accrues when the agency has taken final action which depends on "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). When a party challenges an agency decision based on NEPA, ordinarily the claim accrues when the EIS, the Record of Decision, or a Finding of No Significant Impact ("FONSI") issues. *Jer-*

---

**18.** Because the concurrence of the owner is necessary to make a land exchange, the Environmental Plaintiffs' interpretation of § 1134(a) is not reasonable, whether or not the BLM actually offered the Barneses an exchange.

**1159**

*sey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 186–87 (4th Cir. 1999); *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater,* 173 F.3d 1033, 1036 (6th Cir.1999); *Mont. Wilderness Ass'n v. Fry,* 310 F.Supp.2d 1127, 1142 (D.Mont.2004).

The RIM Plan Decision and the Access Decision and the FONSIs for those decisions issued in 1996. The Environmental Plaintiffs filed suit in 2000, well within the six-year limitation period. Further, the Environmental Plaintiffs were required to file an amended complaint to address the IBLA decisions issued in 1999, which were determined to be the final agency action for purposes of APA review.

 The defendants argue that the Environmental Plaintiffs' NEPA claims are time barred because they include challenges to the Grazing EA and Decision which issued in 1991, more than six years before they brought suit. The Environmental Plaintiffs' claim asserting improper segmentation of the environmental assessments into the Grazing EA, the RIM Plan EA, and the Access EA does address the Grazing EA and Decision. However, the claim addresses the Grazing EA and Decision only as part of an ongoing improper process that was not complete until final agency action resulted in the RIM Plan Decision and the Access Decision, as affirmed by the IBLA. Because the IBLA decisions, which completed the decision-making process that began with the Grazing EA and Decision and continued through the RIM Plan EA and Decision and the Access EA and Decision, are within the six year period before the complaint was filed, the NEPA claims are not time barred.

B. *Reasonable Alternatives*

 NEPA requires a federal agency to consider a reasonable range of alterna-tives to the proposed action. *See* 42 U.S.C. § 4332(C)(iii) & (E); *Hells Canyon Alliance v. U.S. Forest Serv.,* 227 F.3d 1170, 1181 (9th Cir.2000) (citing § 4332(E) and 40 C.F.R. §§ 1500.2(e) and 1502.14(a)). The requirement to consider reasonable alternatives is the "heart" of the environmental review process. *See Kootenai Tribe,* 313 F.3d at 1120 (citing 40 C.F.R. § 1502.14). Reasonable alternatives are those that are feasible, consistent with the reasonable objectives of the action, and sufficient to permit a reasoned choice. *See Hells Canyon,* 227 F.3d at 1181; *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir.1998); *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir.1996).

The Environmental Plaintiffs contend that the BLM failed to consider reasonable alternatives in the RIM Plan EA and the Access EA. In particular, the Environmental Plaintiffs argue that the BLM failed to analyze an alternative that would reduce or eliminate cattle grazing on parts of the Santa Maria Ranch allotment and the Santa Maria Community allotment in order to reduce the need for motor vehicle use, road construction, and water developments. The BLM also refused to analyze alternatives that would limit the number of water developments to be reconstructed and maintained and that would restrict motor vehicle use to routes that are passable without reconstruction.

In response, the defendants quote the part of the IBLA decision which discusses other alternatives considered in the RIM Plan EA and states that the BLM considered and rejected the alternatives of limiting the number of water developments and access to passable routes. The IBLA noted that the purpose of the RIM Plan EA was to determine how to maintain all range developments that had historically been in the area, not to reduce the number

of developments. The IBLA also noted that the wilderness designation did not require the BLM to consider eliminating grazing on parts of the allotments.

The IBLA does not, however, explain why the broad purpose of restoring all of the historical grazing developments in the area was reasonable or whether the range of alternatives analyzed by the BLM provided a sufficient basis for a reasoned choice. Instead, the RIM Plan EA and to some extent the Access EA were driven by the requirements put in place by the Grazing EA and Decision in 1991. *See* Ex. V, RIM Plan at 5 ("Repair and maintenance of the following rangeland developments within the Santa Maria Ranch Grazing Lease Allotment in the Arrastra Mountain Wilderness are necessary to implement the grazing system authorized in a 1991 grazing decision."). The question of whether the range of alternatives considered in each EA was appropriate under NEPA is intertwined with the Grazing EA and Decision and is addressed in the next section.

### C. *Segmentation or Tiering*

In this case, the BLM prepared separate EAs for grazing on the Santa Maria Ranch allotment, for the access routes and range development repair and maintenance proposed in the RIM Plan, and for access to the Peeples Canyon inholding. The Environmental Plaintiffs argue that one comprehensive environmental review was required by NEPA for all of the actions. The defendants contend that the assessment was properly tiered into three separate assessments.

■ Under NEPA, an agency may avoid duplication and delay in the environmental assessment process by initially addressing a broad national program or policy statement and subsequently analyzing narrower specific environmental issues encompassed within the general matter. *See Churchill County*, 276 F.3d at 1074 (citing 40 C.F.R. § 1508.28).[19] Such an approach is referred to as "tiering." *Id.* In contrast, connected, cumulative, or related actions must be assessed together for environmental impact. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); 40 C.F.R. § 1508.25; *accord Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893 (9th Cir.2002); *Churchill County*, 276 F.3d at 1075. "A segmentation is improper when the segmented project has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation." *One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 894 (8th Cir.2004).

■ The BLM contends that the separate EAs for each action constitute appropriate tiering of the environmental review process. The Environmental Plaintiffs argue that because the 1996 BLM decisions to allow road repair and maintenance are based on its 1991 decision to allow grazing, the environmental impact of all of the actions should have been considered together. The Environmental Plaintiffs rely on the analysis of improper segmentation in *Thomas v. Peterson*, 753 F.2d 754, 760 (9th Cir.1985).

In *Thomas*, a group of plaintiffs challenged the Forest Service's separate decisions to authorize the sale of timber in a national forest and to permit construction of a road to access the timber. *Id.* at 756. The NEPA issue presented was "whether the road and the timber sales are sufficiently related so as to require combined treatment in a single EIS that covers the

---

**19.** The Council on Environmental Quality regulations are "binding on all federal agencies and provide guidance to the courts for interpreting NEPA requirements." *ONRC Action v. BLM*, 150 F.3d 1132, 1138 n. 3 (9th Cir.1998) (quotation omitted).

cumulative effects of the road and the sales." *Id.* at 757. The court applied the definition of connected actions provided in 40 C.F.R. § 1508.25(a)(1) (1984) and concluded that the road and sale of timber could not proceed separately, were interdependent parts of a larger action, and, therefore, were "connected actions." *Id.* at 758–59. The court also concluded that the road and timber sales were cumulative actions under § 1508.25(a)(2) that required a single EIS. *Id.* at 759. Further, the court held that under prior Ninth Circuit NEPA precedent, the proposed road construction and the proposed timber sales had to be addressed in a single Environmental Impact Statement ("EIS") because "it would be irrational to build the road and then not sell the timber to which the road was built to provide access." *Id.*

On review of the Access Decision, the IBLA distinguished *Thomas* on the ground that the Barneses' right to access their inholding in Peeples Canyon is independent of the BLM's decision to authorize grazing on the Santa Maria allotment and concluded that the decisions were properly tiered. The Access Decision, however, authorized motorized and mechanized use "when needed for the *grazing*, recreational and other private purposes for which the land is currently held or used." Ex. B, Dec. at 1 (emphasis added). As such, grazing is an integral part of the purpose for the Access EA. In addition, the RIM Plan Decision covers part of the access route that is also addressed in the Access Decision. Because the IBLA decision failed to address the overlap between the Access Decision and the RIM Plan and Grazing Decisions and instead erroneously concluded that the Access Decision was independent of the others, it must be set aside.

For purposes of the RIM Plan Decision, the IBLA held that *Thomas* did not apply

because the grazing and range developments authorized by the RIM Plan were not "new" activities, unlike the timber sales and road construction authorized in *Thomas*. As such, it is not clear whether the IBLA decision is based on a theory that environmental review was unnecessary because the proposed activities already existed or whether the IBLA interpreted *Thomas* to include a provision that only "new" activities might be sufficiently cumulative, related, or connected to require comprehensive review. Nothing in *Thomas* suggests that the prohibition against improper segmenting is limited to "new" activities. In addition, the BLM decided that environmental review of the actions was necessary under NEPA.

Since *Thomas,* the Ninth Circuit has provided additional guidance in discerning improper segmentation of environmental review from appropriate tiering. *See, e.g., Churchill County,* 276 F.3d at 1072–79; *Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1116–19 (9th Cir.2000); *Muckleshoot,* 177 F.3d at 810–11 (9th Cir.1999); *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214–15 (9th Cir.1998). In *Native Ecosystems,* the court again considered the sufficiency of environmental review of proposed timber sales and concomitant road work in a national forest. *See* 304 F.3d at 890–91.

In *Native Ecosystems,* the issue was the maximum road density standard in the National Forest Plan. *Id.* The Forest Service conceded that the road density existing after the proposed timber sale would violate that standard and adopted a site-specific amendment to waive the road density requirement for the timber sale. *Id.* at 891. The Forest Service further acknowledged that amendments would also be necessary for other proposed timber sales in the area. *Id.* The plaintiffs argued

that a single comprehensive environmental review was required for all of the proposed sales that would require road density amendments. *Id.* at 893.

The court applied "an 'independent utility' test to determine whether [the proposed] actions [were] connected so as to require an agency to consider them in a single NEPA review." *Id.* at 894 (quoting *Wetlands Action Network*, 222 F.3d at 1118). The court first held that each timber sale could be held separately and had independent utility so that the separate road density amendments were not an improper segmentation of environmental review. *Native Ecosystems*, 304 F.3d at 894–95. With respect to the cumulative effects of the sales and amendments, however, the court concluded that the EA for the first proposed sale was insufficient because it did not analyze "all reasonably foreseeable future road density amendments" as required by NEPA. *Id.* at 897.

In this case, the Grazing EA and Decision were the basis of and the motivating force behind the subsequent environmental assessments for the RIM Plan and Access Decisions. But for the Barneses' application to reactivate the Santa Maria Ranch's grazing rights, the RIM Plan EA would not have been necessary. That is, without grazing livestock there would be no need for range improvement and maintenance. As such, the RIM Plan Decision would be illogical without the Grazing Decision.

The Access EA was also premised at least in part on the Barneses' asserted need to access their inholding for purposes of grazing livestock. At the very least, the evaluation of the Barneses' need to access their inholding in the Access EA would have been different absent the asserted grazing purpose. To the extent the Access EA is premised upon the Grazing Decision, it also is illogical standing alone.

The three assessments and decisions are interconnected and do not operate independently. The IBLA both applied the wrong legal standard and decided arbitrarily that the three actions were decided through appropriate tiering. Therefore, the IBLA decisions must be set aside.

*Conclusion*

The Barneses' motion for summary judgment (NH document no. 33) is denied. The defendants' motion for summary judgment on the Barneses' claims (NH document no. 29) is granted. The Environmental Plaintiffs' motion for summary judgment (NH document no. 27) is granted in that the IBLA decisions affirming the RIM Plan Decision and the Access Decision are vacated for the reasons stated in this order. The defendants' motion for summary judgment on the Environmental Plaintiffs' claims (NH document no. 30) is denied. The stipulated motions to extend time (NH documents no. 34, 37, & 38) and the environmental plaintiffs' motion to exceed the page limit (NH document no. 42) are granted.

Because the IBLA decisions are vacated, the actions authorized by the RIM Plan Decision and the Access Decision must be re-evaluated by the BLM. The parties shall submit an agreed proposed injunction, that is consistent with this order, **on or before August 20, 2004.** Until a permanent injunction issues, the parties shall take no action that is authorized by the RIM Plan Decision or the Access Decision and shall maintain the status quo as has been the case during the pendency of this action.

SO ORDERED.